## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

AUG - 4 1998

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

| | |
|---|---|
| MYLAN LABORATORIES INC.,<br>a Pennsylvania corporation | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| VIVORX DIABETES, INC.,<br>a California corporation, | )<br>)<br>) |
| Defendant. | )<br>) |

No. 1:98cv115

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff, Mylan Laboratories Inc. ("Mylan"), by its counsel, for its Complaint against

Defendant, VivoRx Diabetes, Inc. ("VDI"), states as follows:

### Parties

1.      Mylan is a Pennsylvania corporation with its principal place of business in

Morgantown, West Virginia.

2.      VDI is a California corporation with its principal place of business in Santa

Monica, California.

### Jurisdiction and Venue

3.      This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1332.  Mylan and

VDI are of diverse citizenship, and the amount in controversy exceeds $75,000, exclusive of

interest and costs.

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as Mylan's principal

place of business is in this district, VDI has conducted business in this district, and VDI has

agreed, as hereafter explained, to arbitrate certain contractual disputes with Mylan in this district.

### Nature of Action

5.     This is an action to compel arbitration pursuant to the Federal Arbitration Act, 9

U.S.C. §§ 1, et seq., wherein Mylan seeks an injunction prohibiting VDI from terminating, or

purporting to terminate, an Exclusive License Agreement between the parties dated July 19,

1994, as amended and supplemented ("Exclusive License Agreement"), and preserving the status

quo, unless and until, as required by the Exclusive License Agreement, VDI has first established

a right to terminate pursuant to an arbitration proceeding held and conducted in Morgantown,

West Virginia, under the arbitration provisions of the Exclusive License Agreement.

### Facts

6.     The parties entered into the Exclusive License Agreement, a true copy of which is

Exhibit "A" hereto, for the purpose of developing and bringing to market in North America, inter

alia, a revolutionary and unique alternative to the traditional treatment of administering insulin

injections to treat Type I diabetes.  It is Mylan's mission to further the advancement of this

treatment in order to improve substantially the quality of life for the millions of insulin-

dependent diabetics in North America.

7.     Under the Exclusive License Agreement, Mylan is the exclusive North American

licensee and, inter alia, based on certain conditions, pursuant to Section 5.1 of the Exclusive

License Agreement, funds the research and development of this revolutionary treatment for

diabetes.  Over the past four years, Mylan has provided to VDI over $26 million in funding and

license payments for the advancement of research and development of this treatment, a project which cannot be duplicated.

8.    Pursuant to the Exclusive License Agreement, VDI agreed that Mylan is the exclusive North American licensee of the technology that is used in connection with this revolutionary treatment.  VDI is precluded under the terms of the Exclusive License Agreement from licensing the technology to any third party in North America.

9.    By letter dated July 28, 1998, a true copy of which is Exhibit "B" hereto, VDI now claims, without substantiation, that Mylan owes it $2,823,565 for funding requirements and that VDI will terminate the Exclusive License Agreement, pursuant to Section 9.4 thereof, if Mylan does not pay VDI said amount by Friday, August 7, 1998.

10.    Mylan does not owe VDI any sums whatsoever and has not committed any breach of the Exclusive License Agreement that would give VDI the right to exercise Section 9.4.

11.    Rather, VDI has breached Section 5.1 of the Exclusive License Agreement by improperly using approximately $12 million in funding provided by Mylan.  VDI has also failed to use its best efforts to diligently develop the treatment and has thus breached Section 14.2 of the Exclusive License Agreement.  Also, VDI has allowed third parties to wrongfully infringe upon certain of Mylan's exclusive ownership rights and has potentially diluted the value of certain of Mylan's trademark rights, all in violation of the Exclusive License Agreement.

12.    Under Section 9.4, VDI does not have the unilateral right to terminate the Exclusive License Agreement as it contends in its July 28 letter.  Rather, before VDI can terminate, Section 9.4 requires VDI to first establish the right to do so under the Breach and Dispute Resolution provisions of the Exclusive License Agreement, Article XXI.  Specifically, before VDI can terminate the Exclusive License Agreement, Sections 21.1, 21.2 and 21.3 of the

- 3 -

Exclusive License Agreement require VDI to first commence an arbitration proceeding in

Morgantown, West Virginia, and establish its right to terminate in that proceeding.

13.    The arbitration requirements were carefully negotiated by Mylan as extremely

significant protection from the very course of action VDI now purports to take. The alleged right

of termination that VDI is attempting to exercise, without substantiation, is a matter that

constitutes an arbitrable dispute under the Exclusive License Agreement.

14.    To permit VDI to terminate the Exclusive License Agreement without first

arbitrating its right to do so, as aforesaid, would enable VDI to subvert and abrogate the

arbitration provisions of the Exclusive License Agreement. In doing so, VDI could purport to

license the technology for this revolutionary treatment to a third party, in direct contravention of

the terms and provisions of the Exclusive License Agreement, placing at risk the time, resources

and monetary investment of more than $46 million that Mylan has devoted to this revolutionary

and unique project.

15.    Mylan will be irreparably harmed if VDI is permitted to subvert the very

protection afforded by the agreed-to arbitration provisions of the Exclusive License Agreement

in that Mylan is threatened with the loss of the license necessary to the furtherance of this unique

project -- which cannot be duplicated -- and the loss of the significant monetary investment, time

and resources that Mylan has expended for more than four years toward the development of

revolutionary medical treatments to the benefit of the public. Mylan is faced with the very real

threat that VDI will attempt to license the technology to competitors in the marketplace.

Moreover, Mylan has foregone numerous business opportunities in reliance upon the continued

term of the Exclusive License Agreement.

16.    The harm to Mylan cannot be remedied by monetary damages alone and substantially outweighs any possible harm to VDI, while an injunction is in the public interest.

17.    Immediate injunctive relief is necessary in order to preserve the status quo between the parties pending a determination by way of arbitration with regard to the existence of VDI's alleged right to terminate.

WHEREFORE, Mylan requests that this Court enter an Order:

a)    Prohibiting VDI from terminating the Exclusive License Agreement without first obtaining an award in arbitration that provides that VDI has the right to do so; and

b)    Requiring VDI to commence an arbitration of these issues pursuant to Article XXI of the Exclusive License Agreement, in Morgantown, West Virginia.

Respectfully submitted,

BUCHANAN INGERSOLL
PROFESSIONAL CORPORATION

Dated:  August 4, 1998                    By:_____

Michael J. Florio
Steptoe and Johnson
Bank One Center
P.O. Box 2190
Clarksburg, WV  26302-2190
(304) 624-8133

Thomas L. VanKirk
Bruce A. Americus
Susan M. Kircher
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA  15219-1410
(412) 562-8800

Attorneys for Plaintiff,
Mylan Laboratories Inc.

## VERIFICATION

I, Roger L. Foster, Vice President of Mylan Laboratories Inc., Plaintiff herein, verify under penalty of perjury that the foregoing **Verified Complaint for Injunctive Relief** is true and correct. This verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

Dated:  August 3, 1998




**DUPLICATE ORIGINAL**

## EXCLUSIVE LICENSE AGREEMENT

This Exclusive License Agreement ("Agreement") is entered into this 19th day of July, 1994, by and between:

> Mylan Laboratories Inc.,
> a Pennsylvania Corporation
> with offices located at
> 781 Chestnut Ridge Road,
> Morgantown, West Virginia 26505
> (hereinafter referred to as "Mylan")

and

> VivoRx Diabetes, Inc.
> a California Corporation
> with offices located at
> 3212 Nebraska Avenue,
> Santa Monica, California 90404
> (hereinafter referred to as
> "Licensor")

WHEREAS, Mylan and VivoRx, Inc. are parties to a letter of intent dated May 24, 1994, said letter indicating the Parties' intent to enter into the present EXCLUSIVE LICENSE AGREEMENT;

WHEREAS, VivoRx, Inc. caused to be transferred all its right, title and interest in, to and under certain technology, know-how and intellectual property rights to VivoRx Cell Therapy, Inc. by operation of the Transfer Agreement, as hereinafter defined, and said transfer being subject to said letter of intent; and

WHEREAS VivoRx Cell Therapy, Inc. has or will within the time periods set forth herein license all its right, title, and

1

interest in said technology (as it relates to the treatment of diabetes) to Licensor; and

WHEREAS, VivoRx, Inc. has received Five Hundred Thousand Dollars ($500,000.00) from Mylan under the terms of the letter of intent; and

WHEREAS , Licensor desires to license the Licensed Technology (as defined below) to Mylan, and Mylan desires to accept such license, on the terms and conditions set forth herein.

NOW THEREFORE Witnesseth that for and in consideration of the covenants and promises set forth herein, and other good and valuable consideration, the sufficiency and receipt of all of which are hereby acknowledged, Mylan and Licensor, intending to be legally bound agree as follows:

ARTICLE  I.            DEFINITIONS

1.1  "Affiliate" shall mean with respect to either Mylan or Licensor any person or entity that directly or indirectly controls, or is directly or indirectly controlled by, or is under common control with such Party.   A person or entity shall be regarded as controlling an entity, if it (i) owns more than fifty percent of the voting stock or other ownership interest of such other entity; or (ii) it directly or indirectly possesses sufficient authority to direct the adoption and execution of the policies, management, and operations of such other entity by any means whatsoever.

2

1.2    "Application" shall mean any and all applications submitted to any federal, state or local government or governmental agency related to the Licensed Technology.

1.3    "Best Efforts" shall mean that degree of skill, knowledge, ability, effort, and resources which one, who is generally regarded or recognized as experienced and knowledgeable with regard to the matters set forth herein, would exercise with respect to fulfilling and otherwise discharging the duties and obligations accepted and the rights granted herein.

1.4    "Business Plan" shall mean that document describing the purpose, methods of operations, policies, procedures, and organization of Licensor, as adopted by Licensor's Board of Directors, in accordance with the Licensor's Shareholders Agreement.

1.5    "Commercial Sale" shall mean the sale of the Licensed Product to third parties, which are not affiliates or sublicensees of Mylan.

1.6    "Contract Year" shall mean a twelve-month period commencing on January 1.

1.7    "Cost of Goods Sold" shall mean with respect to a Party, such Party's "Cost of Goods Sold" as determined pursuant to GAAP, with respect to the Licensed Product. Specifically this amount shall include:

(a)    material cost directly related and allocable to the Licensed Product;

3

(b)  direct labor charges incurred in the manufacturing of the Licensed Product;

(c)  indirect labor and overhead charges allocated to the Licensed Product in a method consistent with the Party's costing system; and

(d)  distribution, warehousing and other costs included within the meaning of "Cost of Goods Sold" under GAAP, related to the Licensed Product not included in (a), (b) or (c) above.

1.8  "Days" shall mean calendar days unless otherwise specified.

1.9  "Designated Private Financing" shall mean any private equity financing of Licensor in which the gross proceeds received by Licensor equal or exceed $15,000,000.

1.10  "Development Costs" shall mean those monies paid to Licensor by Mylan or in Mylan's behalf, and used to further the research and development of polymers for the encapsulation and transplantation into patients of pancreatic islet cells, including amounts expended for clinical trials and other amounts necessary to obtain FDA approval for, and to commercialize, the Licensed Technology and the Licensed Product.

1.11  "Effective Date" shall mean the date of this Exclusive License Agreement as set forth above.

1.12  "End User" shall mean with respect to Affiliates and Sublicensees of Mylan those Affiliates and Sublicensees

4



which, (a) are certified or otherwise licensed and fully qualified under relevant laws and regulations, to administer the Licensed Product, and to provide such other care as is necessary or appropriate with respect to the administration of such product; and (b) administer the Licensed Product, and provide such other services as described above.

1.13 "FDA" shall mean the United States Food and Drug Administration.

1.14 "FFDCA" shall mean the Federal Food Drug and Cosmetic Act, as amended 21 USC 301 et seq. and any other relevant Federal or State laws, or municipal ordinances, or regulations thereunder pertaining to the safety, efficacy, adulteration, mishandling, packaging, labelling, transportation or storage of pharmaceutical ingredients or finished pharmaceutical products which are or may be applicable to the Licensed Product during the term hereof.

1.15 "GAAP" shall mean Generally Accepted Accounting Principles as used and defined in the United States.

1.16 "Improvement" shall mean any methods, uses, applications, information, data, discoveries, creations, designs, derivatives, inventions, ideas or trade secrets, whether or not patented or patentable, and whether or not copyrighted or copyrightable, which are directly or indirectly related to the Licensed

5



Technology, which are developed, discovered, conceived, or are otherwise acquired or possessed by either Party, or their subsidiaries, affiliates, employees, agents, sublicensees or assigns, and which increase or enhance the performance, economics, safety and/or efficacy of (or otherwise relate to) the Licensed Product.

1.17 "IPO" (Initial Public Offering)  shall mean the first underwritten public offering of Licensor's Common Stock.

1.18 "Licensed  Know-How"  shall  mean  all  knowledge, information, data, designs, ideas, concepts, methods, techniques,  trade  secrets  and  expertise,  whether patented  or  unpatented,  whether  copyrighted  or copyrightable, and whether or not capable of separate or precise definition or identification, but which in the aggregate allows one to accomplish that which could not have  otherwise  been  accomplished,  whether  acquired through trial and error, experience, or other means, now or hereafter created, discovered, or otherwise acquired, possessed or controlled by Licensor which is directly or indirectly  relevant to the development,  manufacture, use or sale of the Licensed Product.

1.19 "Licensed  Patents"  shall  mean  those  patents  and applications identified in Exhibit A, as well as all continuations, continuations-in-part, reexaminations, reissuances and/or extensions thereof, or additional patents related thereto which are owned or acquired by

Licensor after the Effective Date.

1.20 "Licensed Product" shall mean a pharmaceutical product in finished dosage form, developed, manufactured, used and/or sold pursuant to the Licensed Technology for the treatment, management, control or cure of diabetes and any Improvement thereon.

1.21 "Licensed Technology" shall mean the Licensed Patents and Licensed Know-How.

1.22 "Licensor" shall mean VivoRx Diabetes, Inc.

1.23 "Mylan" shall mean Mylan Laboratories Inc.

1.24 "Net Sales" shall mean:

(a) with respect to Commercial Sales of the Licensed Product by Mylan, its sublicensees and Affiliates (other than Affiliates and sublicensees which are End Users of the Licensed Product), the gross amount invoiced therefor, less

(i) quantity and/or normal and customary cash discounts allowed or taken;

(ii) freight, postage and insurance related to such sales;

(iii) customs duties and taxes paid related to such sales;

(iv) credits, rebates and/or adjustments allowed or given by reason of Licensed Product expiration dating, rejections or returns (not to exceed 1% of gross Units), retroactive

7

price reductions or programs with wholesalers or other distributors or resellers according to which they are entitled to chargeback rebates, credits or adjustments, upon their sales to their customers;

(v) rebates, administrative fees, reimbursements or similar payments to or for Medicaid or any other government programs (whether mandated or voluntary), hospitals, health maintenance organizations, insurance carriers, buying groups or other entities in connection with the purchase or utilization of Licensed Product; and

(b) With respect to sales of the Licensed Product to End Users which are Affiliates or sublicensees of Mylan, the greater of:

(i) the amount received for such sale; or

(ii) the amount that would have been received pursuant to subsection (a) above if the purchaser were not an Affiliate of Mylan.

1.25 "Parties" shall mean Mylan and/or Licensor as either is defined herein, in singular or plural usage as required by the context.

1.26 "Quarter" shall mean any of the three calendar month periods beginning on January 1, April 1, July 1, and October 1 in each year.

8

1.27  "Territory" shall mean the United States, Canada, Mexico and their respective territories, protectorates, and commonwealths.

1.28  "Transfer Agreement" shall mean the VivoRx Cell Therapy, Inc. Proprietary Technology and Intellectual Property Transfer Agreement dated June 10, 1994 among VivoRx Cell Therapy, Inc., Transplant Research Institute and Clover Consolidated Limited.

1.29  "Year" shall mean a period of three hundred sixty-five (365) consecutive days more or less beginning at midnight on January 1, and ending at midnight on December 31 in each calendar year.

ARTICLE II.            GRANT OF LICENSE

2.1  Subject to the terms hereof, Licensor hereby grants to Mylan an exclusive license under the Licensed Technology to make, have made, use and sell the Licensed Products in the Territory. Mylan shall have the right to sublicense all or part of its rights under this Agreement to one or more reputable, nationally recognized parties who have the financial, scientific and other resources necessary to fulfill its obligations under said sublicenses. Any such sublicensee shall not have the right to grant further licenses. The effectiveness of any such sublicense shall be conditioned on the execution of a sublicense agreement containing obligations of sublicensee in favor of Licensor substantially identical to those set forth in Sections 4.2, 7.1,

9

14.1 and Articles X, XI, XII, XIII, XXI, XXV, XXVI and XXVII hereof.

2.2  Except as otherwise set forth herein, during the term of this Agreement, Licensor shall not use or otherwise practice the Licensed Technology in the Territory or make, have made, use or sell the Licensed Product in the Territory, or grant any license or right to any third party to do so in the Territory.

2.3  Upon expiration of the last to expire of the Licensed Patents, and provided Mylan shall have fully paid all royalties and other amounts which shall have become due hereunder, the licenses granted hereunder shall become fully paid and royalty free thereafter.

2.4  Within thirty (30) days after the execution of this Agreement, Licensor shall cause VivoRx Cell Therapy, Inc. to license all of the intellectual property rights set forth in Exhibit A hereto (for application in the treatment of diabetes). No monies will be paid to Licensor by Mylan until said transfer has been completed regardless of what may be set forth elsewhere herein to the contrary.

2.5  The above-referenced license shall contain such terms, conditions, and covenants (terms) as are necessary and appropriate for Licensor to perform all its obligations hereunder.  Such terms shall include by way of illustration, and not of limitation;

(a)  an irrevocable term of not less than the term of this Agreement;

(b)  recognition and acceptance of Mylan's right to practice

10

the Licensed Technology and make, use, or sell the
Licensed Product royalty free following the expiration
of the last to expire of the Licensed Patents;

(c)   Mylan's exclusive ownership of the Trademark; and

(d)   a requirement that VivoRx Cell Therapy, Inc. and
Licensor shall each carry (or be covered by) liability
insurance in an amount not less five million dollars
($5,000,000.00) naming the other as an additional
insured, to cover all claims by third parties which
reasonably might result from acts for which either is
liable hereunder.


ARTICLE III.        LICENSE FEE

Subject to Section 2.4 above, Mylan shall pay to Licensor a
License fee in the amount of five million dollars ($5,000,000.00)
which shall be payable as follows:

3.1   On May 24, 1994, Mylan prepaid a portion of the License
Fee to VivoRx, Inc. in the amount of five hundred thousand dollars
($500,000.00), receipt of which is hereby acknowledged by
Licensor.

3.2   On July 29, 1994 or upon the completion of the transfer
set forth in Section 2.4, whichever is the last to occur, Mylan
shall pay to Licensor the sum of  five hundred thousand dollars
($500,000.00).

3.3   On October 15, 1994 Mylan shall pay to Licensor the sum
of five hundred thousand dollars ($500,000.00).

3.4  Should this License remain in force, without any interruptions pursuant to Article V, Section 5.1, Mylan shall in such event, pay to Licensor three and one-half million dollars and($3,500,000.00) pursuant to the following schedule:

i)  On August 15, 1995, Mylan shall pay to Licensor the sum of five hundred thousand dollars ($500,000.00);

ii)  one million dollars ($1,000,000.00) upon acceptance by the FDA of Licensor's Investigational New Drug Application for the Licensed Product; and

iii)  two million dollars ($2,000,000.00) upon FDA approval of Licensor's 510(k) Application for the Licensed Product.

ARTICLE IV.        PAYMENTS AND ROYALTIES

4.1  In addition to the License fee, Mylan shall pay to Licensor Licensed Product royalties on Net Sales of the Licensed Product (whether made by Mylan, its sublicensees or Affiliates) in the manner described in Section 4.6.  Royalty payments shall be paid by Mylan not later than forty-five (45) days after the end of the Quarter for which such payments are due and payable, based upon Net Sales consummated during the immediately preceding Quarter and shall be accompanied by a certificate of Mylan's chief financial officer as to the amount of such Net Sales.  Within ninety (90) days after the end of each Mylan fiscal year (April 1 - March 31) Mylan shall cause its independent auditors to certify to Licensor as to the audited amount of Net Sales in such fiscal year.

12

4.2  Mylan shall maintain (and shall cause its sublicensees
to maintain) such books and records as are reasonably necessary to
determine the amount of Licensed Product royalty due Licensor.
Such records shall be maintained in accordance with GAAP and will
be available for audit by representatives of Licensor.  Such
audits shall be limited to two (2) in each of the first two (2)
Contract Years, beginning with the year in which Commercial Sales
commence, and once in each contract year thereafter.  Said audit
shall be conducted by a public accounting firm reasonably
acceptable to both Parties.  Licensor shall conduct such audits
during Mylan's regular business hours and same shall be completed
in an expeditious and diligent manner.

4.3  Should any audit referenced in Section 4.2 above result
in the disclosure of an error in favor of Licensor, Mylan shall
immediately correct such error, and in the case of an error of
five percent (5%) or more, pay the reasonable costs of said audit
unless Mylan disagrees with the results of said audit.  Any
dispute with respect to the results or the method by which the
audit is conducted shall be resolved pursuant to Article XXI.
Should Mylan disagree with the results of the audit or the methods
by which same is conducted, it shall not be required to make any
such payment pending the outcome of the dispute resolution process
set forth in Article XXI.

4.4  Subject to Section XII hereof, in the event that Mylan
is required by a court of competent jurisdiction (or pursuant to
an arrangement consented to by Mylan and Licensor) to pay

13

royalties or other consideration to manufacture, use or sell the Licensed Product to any third party who claims that the Licensed Technology, or the Licensed Product, as licensed hereunder, infringes the patent or other proprietary rights of said third party (other than a trademark or similar right of such person), the royalties payable to Licensor hereunder shall be reduced by the amount of such payment (not to exceed one-half (½) of each quarterly payment) for so long as such payment is required to be provided to such third party.

4.5    Subject to Section XII hereof, in the event that Mylan is required to pay royalties or other consideration to any third party who claims that Mylan's trademark is infringing the trademark rights of such person, Mylan shall be solely responsible for such payment.   Mylan shall be responsible for paying all royalties (accrued after the Effective Date) payable to Damon and UCLA which have heretofore licensed any portion of the Licensed Technology to Licensor (or its parents or licensors).

4.6    Mylan shall pay Licensed Patent royalties to Licensor based on annual Net Sales pursuant to the following schedule:

| Annual Net Sales | Royalty |
|---|---|
| $0 ≤ $150 Million | 15% |
| > $150 ≤ $200 Million | 16% |
| > $200 ≤ $250 Million | 17% |
| > $250 ≤ $300 Million | 18% |
| > $300 ≤ $350 Million | 19% |
| > $350 Million | 20% |

14

For example if annual Net Sales are $401 Million, the royalty due Licensor would be $80.2 Million (20% of $401 Million).

4.7   Notwithstanding anything to the contrary which may be set forth elsewhere herein (subject to the obligation of Mylan under Section 4.1 to pay royalties to Licensor based on Net Sales) Licensor shall not be entitled to receive from Mylan, and Mylan shall not be required to pay any monies to Licensor based on:

    (a)  sales or transfers of the Licensed Product by Mylan to Mylan's Affiliates or sublicensees;

    (b)  royalties received by Mylan from its Affiliates or sublicensees, or;

    (c)  any other consideration paid by said Affiliates or sublicensees to Mylan,

    in each case unless such Affiliate or sublicensee is an End User.

ARTICLE V.                 FUNDING

5.1  Beginning with the Effective Date, Mylan will be responsible for funding, or securing funds, in an amount and at the times consistent with the Business Plan adopted by Licensor's Board of Directors or a binding commitment to provide such funds, for research and development of the Licensed Product. Mylan shall pay (or cause to be paid) such funds to Licensor at the times and in the manner set forth in the Business Plan. Should Mylan, for any reason be unable to secure said funds or a commitment for such funds during the twelve (12) month period commencing on the

15

Effective Date, this Agreement shall terminate (subject to Section 5.2 below) and Licensor shall immediately reimburse Mylan for the License fees paid, pursuant to § 3.1, 3.2 and 3.3 above, (or deliver to Mylan a note which is non-interest bearing for one (1) year, and thereafter is interest bearing at the prime rate, in the principal amount equal to the amount of such fees paid, with a maturity date of ten (10) days after the consummation of an IPO or Designated Private Financing, if any).

5.2  If this Agreement is terminated pursuant to Section 5.1 above, and thereafter Licensor commences an IPO (or Designated Private Financing), Licensor shall reserve such number of shares in such IPO (or Designated Private Financing) as are equal to an aggregate five million dollars ($5,000,000.00) offering price and shall offer such shares to Mylan at said offering price for purchase as part of the IPO.  Mylan shall then have the option to elect to subscribe to the purchase of such shares as part of the IPO (or Designated Private Financing) which election must be made within thirty (30) days of such offer by Licensor.  In the event Mylan elects to so subscribe to such shares as part of the IPO (or Designated Private Financing) and in the event such IPO (or Designated Private Financing) is consummated in accordance with its terms, then Mylan shall have the exclusive option, without additional consideration, and  for a period of six (6) months following  consummation  of  the  IPO  (or  Designated  Private Financing),  to reinstate this Agreement on the same terms and conditions as those set forth herein (except for payments that

16

would have been made by certain dates pursuant to Section 5.1, which will be suspended for the period of time during which this Agreement was terminated, and paid promptly upon such reinstatement), and further excepting any requirements set forth herein for additional equity investments or payments by Mylan to Licensor of any funds other than the royalties, licensing fees, and Development Costs contemplated elsewhere herein.

5.3   Licensor hereby agrees that until the expiration of Mylan's option to reinstate this Agreement as provided for in Section 5.2, Licensor shall not license, sublicense or encumber in any way the Licensed Technology which would adversely affect Mylan's option to make, use or sell the Licensed Product in the Territory; provided, that Licensor may enter into preliminary discussions or negotiations with third parties regarding the same.

ARTICLE VI.            WARRANTIES AND REPRESENTATIONS

6.1   Licensor warrants and represents that:

    (a)   It has the requisite corporate authority to enter into this Agreement;

    (b)   The person signing this Agreement has the necessary corporate authority to legally bind Licensor to the terms set forth herein;

    (c)   The execution by Licensor of this Agreement and the performance by Licensor of the terms set forth herein will not cause Licensor to be in material conflict with or constitute a material breach by

17

Licensor of any agreement or understanding with any third party (except where such conflict would not have a material adverse affect to the license granted herein or otherwise materially interfere with or materially delay the development, approval, and/or commercialization of the Licensed Product as contemplated herein);

(d)   To its knowledge and belief there are no suits, actions, investigations, by either a government agency or an individual, related to the matters set forth herein;

(e)   All Licensed Products, if manufactured by Licensor, will be manufactured, stored, and shipped in material compliance with FDA regulations, pertinent approval documents and those statutes and regulations pertaining to the safety and efficacy of medical devices and where applicable, pharmaceutical products;

(f)   To its knowledge and belief, the Licensed Technology, and the practice and commercialization thereof as contemplated hereby, the manufacture, use and sale of the Licensed Product do not infringe the rights of any third party;

(g)   The execution of this Agreement and Licensor's performance hereunder do not and will not be in conflict with any law, ordinance, statute or

18

regulation (except where such conflict would not have a material adverse affect to the license granted herein or otherwise materially interfere with or materially delay the development, approval, and/or commercialization of the Licensed Product as contemplated herein); and

EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 6.1, LICENSOR (i) SPECIFICALLY DISCLAIMS ALL WARRANTIES OF ANY KIND REGARDING THE LICENSED TECHNOLOGY, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, (ii) AND MAKES NO REPRESENTATION REGARDING THE SUITABILITY OF THE LICENSED TECHNOLOGY FOR MYLAN'S OR ANY THIRD PARTY'S REQUIREMENTS.

6.2   Mylan warrants and represents that

(a)   It has the requisite corporate authority to enter into this Agreement;

(b)   The person signing this Agreement has the necessary corporate authority to legally bind Mylan to the terms set forth herein;

(c)   The execution of this Agreement by Mylan and the performance by Mylan of the terms set forth herein will not cause Mylan to be in any material conflict with or constitute a material breach by Mylan of any agreement or understanding with any third party;

(d)   To its knowledge and belief there are no suits, actions, investigations, by either a government agency or any individual related to the matter set forth herein; and

19.

(e)  The execution of this Agreement and Mylan's
performance hereunder do not and will not be in
material conflict with any law, ordinance, statute
or regulation.

ARTICLE VII.        INSPECTIONS

7.1  Each Party shall permit the other Party's personnel
(employees or consultants), upon reasonable notice, to visit at
reasonable intervals (not more than once every six months), and
for reasonable durations during regular business hours, any
facility used for the research, development or manufacture of the
Licensed Product or use of the Licensed Technology, and will allow
such personnel to review any relevant records (including, but not
limited to, financial records), data, information, documents
and/or reports in any media or format in connection therewith.

ARTICLE VIII.       MANUFACTURING

8.1  Licensor shall have the right, upon written notice to
Mylan, to manufacture all of Mylan's (or its sublicensee's)
requirements of the Licensed Product.

8.2  Should Licensor manufacture the Licensed Product on
behalf of Mylan, Mylan shall have the right to purchase
Licensor's relevant manufacturing facility, equipment and
technology following the end of Licensor's seventh year of
manufacturing at a purchase price equal to their fair market
value, and such right shall be evidenced by appropriate

documentation executed by the Parties.

8.3  Should Licensor manufacture the Licensed Product on behalf of Mylan, Mylan shall pay to Licensor an amount not to exceed Licensor's Cost of Goods Sold plus four percent (4%) of such costs, which payment shall be made within forty-five (45) days after a written invoice therefor.


ARTICLE IX.            TERM AND TERMINATION

9.1  The term of this Agreement shall begin on the Effective Date and end on the date of expiration of the last to expire of the Licensed Patents, unless terminated prior to such date pursuant to this Article IX or Section 5.1.

9.2  Subject to Article XXI; Mylan may terminate this Agreement by a written notice to Licensor if during the term hereof:

> (i)  Licensor commits a breach of any material or substantial term set forth herein and fails to cure same within thirty (30) days of Mylan's notice of said breach.

> (ii) Mylan discovers any warranty or representation made by Licensor shall prove to have been incorrect in any material respect on or as of the date made, which has a material adverse effect on Mylan's rights hereunder which is not cured within thirty (30) days of Mylan's notice thereof.

21



9.3   Mylan may terminate this Agreement at any time should it conclude that the development, manufacture, use, or sale of the Licensed Product or the practice of the Licensed Technology is not scientifically   or economically feasible, or not in Mylan's best interest.

9.4   Subject to Article XXI, Licensor may terminate this Agreement by written notice if during the term hereof:

(i)   Mylan shall fail to pay any amounts payable to Licensor hereunder (and such payment is not made within ten (10) days after written notice thereof by Licensor) or Mylan commits a breach of any other material or substantial term set forth herein and fails to cure said breach within thirty (30) days of Licensor's notice of said breach.

(ii)  Licensor discovers any warranty or representation of Mylan shall prove to have been incorrect in any material respect on or as of the date made, which has a material adverse effect on Licensor's rights hereunder which is not cured within thirty (30) days of Licensor's notice thereof.

ARTICLE X                    EFFECTS OF TERMINATION

10.1  Upon termination of this Agreement pursuant to Section 9.2, 9.3 or 9.4 hereof (i) the license granted to Mylan hereunder shall terminate, (ii) Mylan shall immediately cease using the Licensed Technology, and (iii) Mylan shall promptly return to the

22

Licensor all documents relating to the Licensed Technology in Mylan's possession or control; provided, that if the Agreement is terminated pursuant to Section 9.2, Licensor shall pay to Mylan fifty percent (50%) of the Licensing fees and Development Costs; provided, further, that if Mylan terminates this Agreement pursuant to Section 9.3, Mylan shall pay Licensor the amount of Development Costs which Licensor would have been entitled to receive under this Business Plan for a period of four (4) months following the date of such a termination.

ARTICLE XI.                    <u>INDEMNIFICATION</u>

11.1 Licensor will indemnify and hold Mylan harmless against any and all liability, damages, losses, costs or expenses ("Expenses") arising out of suits or claims based upon patent infringement, and/or the manufacture and/or design of the Licensed Product for so long as Licensor manufactures the Licensed Product and thereafter for any claims which arise from Licensed Product manufactured by Licensor, including, without limitation, the obligations to defend fully, and to reimburse Mylan for all costs including attorneys fees incurred by Mylan in connection with such defense. Licensor's indemnification for patent infringement claims shall, as described in Section 4.4, be limited to and paid at a rate of not more than fifty percent (50%) of Quarterly royalty payments due Licensor.

11.2 Mylan will indemnify and hold Licensor harmless against any and all Expenses arising out of suits or claims based upon

Mylan's handling, packaging, labeling, storage, distribution, and/or marketing of the Licensed Product, other than that arising from claims based upon patent infringement including, without limitation, the obligations to defend fully, and to reimburse Licensor for all costs including attorneys fees incurred by Licensor in connection with such defense.  Should Licensor choose not to manufacture the Licensed Product pursuant to Article VIII, Mylan will indemnify and hold Licensor harmless against any and all Expenses arising out of suits or claims based upon the design and/or manufacture of the Licensed Product, including, without limitation, the obligations to defend fully, and to reimburse Licensor for all costs including attorneys fees incurred by Licensor in connection with such defense.

11.3  Mylan and Licensor shall each carry product liability insurance in an amount not less than five million dollars ($5,000,000.00) naming the other as an additional insured, to cover all claims by third parties which reasonably might result from acts for which either is liable hereunder.

11.4  In no event shall either Party or any of their respective Affiliates (or any of their respective officers, directors or shareholders) be liable to the other party for any special or consequential damages, or loss of profits (other than past-due royalties), resulting from the use or commercialization, or inability to use or commercialize the Licensed Technology or otherwise arising out of this Agreement.

24

ARTICLE XII.        INFRINGEMENT BY THIRD PARTIES

12.1  Should either Party learn of any facts or circumstances which could be reasonably construed as infringing on the Licensed Technology, Licensed Products or Trademark, such Party will immediately notify the other of same.

12.2  Licensor, at its own expense, shall have the right, but not the obligation, to elect within thirty (30) days of the notice described in Section 12.1 to defend the Licensed Technology against acts of infringement by third parties.  Should Licensor elect to undertake such defense, Mylan shall provide Licensor with such non-financial assistance as may be reasonably required or necessary in order for Licensor to effectively prosecute the issues.  Should Licensor succeed in causing the termination of the infringing activity through a settlement or verdict, Licensor shall be entitled to retain all the proceeds, if any, resulting therefrom.

12.3  Should Licensor fail or refuse to elect within such period to defend the Licensed Technology against such acts of infringement, Mylan at its own expense, shall have the right, but not the obligation, to do so.  Should Mylan elect to undertake such defense, Licensor shall provide Mylan with such non-financial assistance as may be reasonably required or necessary in order for Mylan to effectively prosecute the issues.  Should Mylan succeed in causing the termination of the infringing activity through a settlement or verdict, Mylan shall be entitled to exclusively retain all proceeds, if any, resulting therefrom.

25

12.4   Mylan, at its own expense, shall have the right but not the obligation, to elect within thirty (30) days of the notice described in Section 12.1 to defend the trademark against acts of infringement by third parties.   Should Mylan elect to undertake such defense, Licensor shall provide Mylan with such non-financial assistance as may be reasonably required or necessary in order for Mylan to effectively prosecute the issues.   Should Mylan succeed in causing the termination of the infringing activity through a settlement or verdict, Mylan shall be entitled to retain all the proceeds, if any, resulting therefrom.

12.5 Should Mylan fail or refuse to elect within such period to defend the trademark identified in Article XIV against acts of infringement, Licensor, at its own expense shall have the right, but not the obligation, to do so.   Should Licensor elect to undertake such defense, Mylan shall provide Licensor with such non-financial assistance as may be reasonably required or necessary in order for Licensor to effectively prosecute the issues.   Should Licensor succeed in causing the termination of the infringing activity through a settlement or verdict, Licensor shall be entitled to retain all the proceeds, if any, resulting therefrom.

XIII.                **DEFENSE OF CLAIMS OF INFRINGEMENT**

13.1   Should a suit be filed against either Party alleging the manufacture, use, or sale of the Licensed Product, the practice of the Licensed Technology, or the use of the trademark

26

infringes the rights of a third party, or should either Party learn of any facts or circumstance which could reasonably be expected to result in such a suit, that Party shall immediately notify the other of such suit, or such facts and circumstances.

13.2   Should any legal action such as that described above be filed or otherwise commenced against Licensor or Mylan with respect to the Licensed Technology, Licensed Patent or Licensed Know-How, Licensor shall have the right, but not the obligation, to elect within thirty (30) days of the notice described in Section 13.1 to defend such suits.  If Licensor refuses to elect within such period to defend said suit, Mylan shall have the right, but not the obligation to do so.  Licensor shall notify Mylan of its intention in sufficient time to allow Mylan to assume the defense, notwithstanding the thirty (30) day period stated above.

13.3   Should any legal action such as that described above be filed or otherwise commenced against Mylan with respect to the trademark, Mylan shall have the right, but not the obligation, to elect within thirty (30) days of the notice described in Section 13.1 to defend such suits.  If Mylan refuses to elect within such period to defend said suit, Licensor shall have the right, but not the obligation to do so.  Mylan shall notify Licensor of its intention in sufficient time to allow Licensor to assume the defense, notwithstanding the thirty (30) day period stated above.

13.4   Should either Party assume the defense of a claim filed against the other it shall do so at its own expense.  The Party

27

against whom such suit is filed shall provide the other Party with such non-financial assistance as may be reasonably required to enable the prosecuting Party to effectively litigate the issues. Any award of damages or other fees or penalties received by the prosecuting Party shall be retained by said Party.

13.5   Licensor shall not enter into any settlement of any suit or controversy involving or related to the Licensed Technology, Licensed Product or the Licensed Patents which would adversely and materially affect Mylan's rights and privileges as set forth herein without first obtaining Mylan's permission to same.  Mylan's permission shall not be unreasonably withheld or delayed.

13.6   Mylan shall not enter into any settlement of any suit or controversy involving or related to the trademark, the Licensed Technology, Licensed Product or the Licensed Patents which would adversely and materially affect Licensor's rights and privileges as set forth herein without first obtaining Licensor's permission to same.  Licensor's permission shall not be unreasonably withheld or delayed.

ARTICLE XIV.        BEST EFFORTS

14.1   Mylan, its assignee, and/or licensee shall, consistent with Best Efforts: (i) diligently promote the sale of Licensed Products in the Territory, after required government approvals are obtained by Licensor; (ii) maintain such staff and facilities as may be reasonably necessary to aggressively promote and sell the

Licensed Products in the Territory; and (iii) shall materially comply with all applicable laws, rules and regulations applicable to Mylan's marketing and sale (and, if applicable, manufacture) of the Licensed Products.

14.2  Licensor and/or its licensee shall consistent with Best Efforts and the Business Plan diligently (i) develop the Licensed Product; (ii) pursue all necessary approvals of government agencies as may be required to develop (and, if applicable, manufacture) the Licensed Product; (iii) maintain such staff and facilities as may be reasonably necessary to obtain and maintain FDA approval of the Licensed Product, and, if Licensor elects to manufacture the Licensed Product (and only for such period as Licensor is manufacturing the Licensed Product), the use of production and laboratory facilities, and equipment and; (iv) materially comply with all applicable laws, rules and regulations applicable to Licensor's development (and, if applicable, manufacture) of the Licensed Products.

ARTICLE XV.        TRADEMARK

15.1 The Licensed Product will be marketed and sold under a registered trademark to be selected and owned by Mylan. Mylan shall be responsible for obtaining such trademark registration.

15.2 Should this Agreement terminate pursuant to Section 9.3 or 9.4, Mylan shall grant to Licensor an exclusive royalty-free license to use the trademark in connection with the production and sale of the Licensed Product in every country of the world except,

29

in the case of a termination under Section 9.4, the U.S., Canada, Mexico, their territories, protectorates and commonwealths.

15.3    Should Mylan terminate this Agreement pursuant to Section 9.2, Licensor shall have no right with respect to the trademark in the Territory.

15.4    Upon expiration of this Agreement, Licensor shall have no rights with respect to the trademark in the Territory; provided, however Licensor shall have a non-exclusive right to use the trademark in all countries of the world, except the U.S., Canada, Mexico, their territories, protectorates and commonwealths.

ARTICLE XVI.    <u>REGULATORY REPORTING REQUIREMENTS</u>

16.1 If Licensor elects to manufacture the Licensed Product, (and only for such period as Licensor is manufacturing the Licensed Product) Licensor shall maintain and fulfill all relevant regulatory requirements that may be applicable to Licensor under the FFDCA, including but not limited to, all FDA reporting requirements, and maintenance of the 510(k) associated with the Licensed Product.    Mylan will provide Licensor with such assistance as may be reasonably required or necessary for Licensor to fulfill such requirements.

16.2 Licensor and Mylan will cooperate in the reporting of adverse drug experience information and other post marketing reports to the FDA as shall from time to time be required.

30

ARTICLE XVII.          ASSIGNMENT

17.1   Neither Party may assign its rights or obligations hereunder without the written consent of other Party; provided, however that each Party may at its sole discretion assign or otherwise transfer all or a portion of its rights, interest and obligations hereunder to a third party which acquires all or substantially all of such Party's assets.

17.2   Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give to any person, other than the Parties to this Agreement, any right, remedy or claim under or by reason of this Agreement or of any term, covenant or condition of this Agreement except as expressly provided for herein.

17.3 Licensor may assign or otherwise transfer all or a portion of the Licensed Patents, Licensed Technology and Licensed Know-How, provided such assignment recognizes Mylan's rights hereunder and such assignee is a reputable organization with the scientific, manufacturing and financial resources required to satisfy Licensor's obligations hereunder.

17.4 This Agreement shall be binding upon and inure to the benefit of the Parties hereto and the successors to all or substantially all of the assets and business of the respective Parties.

31

ARTICLE XVIII.     TECHNICAL ASSISTANCE

Licensor shall provide Mylan with such technical, scientific and regulatory information and assistance as may be reasonably requested by Mylan relating to the safe and efficient manufacture, distribution, promotion and sale of the Licensed Product.  Mylan shall reimburse Licensor for all reasonable travel and other out-of-pocket expenses related to such assistance.

ARTICLE XIX.     GOVERNING LAW

The validity and interpretation of this Agreement and the legal relations of the Parties to it shall be governed by the internal laws and  not the law of conflicts, of the state of New York.

ARTICLE XX.     FORCE MAJEURE

If any Party is prevented from complying, either totally or in part, with any of the terms or provisions of this Agreement, by reason of force majeure, including, but not limited to fire, earthquake, flood, explosion, storm, strike, lockout or other labor trouble, riot, war, rebellion, accidents, acts of God or governmental agencies or instrumentalities and/or any other cause or externally induced casualty beyond its reasonable control, whether similar to the foregoing matters or not, then written notice by the Party liable to perform to the other Party, identifying the requirements of this Agreement or such of its provisions as may be affected, and to the extent so affected,

performance thereof shall be suspended during the period of such disability; provided that the Party asserting force majeure shall bear the burden of establishing the existence of such force majeure by a preponderance of the evidence; and provided further, that the Party prevented from complying shall use its best efforts to remove such disability, and shall continue performance with the utmost dispatch whenever such causes are removed, and shall notify the other Party of the event not more than five (5) working days from the time of the event.

ARTICLE XXI.        <u>BREACH AND DISPUTE RESOLUTION</u>

21.1  Should either Party reasonably believe the other has committed a breach of this Agreement (or that a representation made by the other was incorrect in any material respect, which inaccuracy has had a material adverse effect on such Party's rights hereunder), such Party shall notify the other in writing stating its belief and setting forth the reasons therefor.

21.2  Except as where specifically provided herein, if the Party in receipt of such notice does not, within thirty (30) days of such notice, remedy such breach (or such material adverse effect), the other Party may, subject to Section 21.5 demand arbitration. Such arbitration must be demanded within one hundred twenty (120) days.

21.3  In addition to the right of a Party to demand arbitration pursuant to Section 21.2, and subject to Section 21.5, should the Parties to this Agreement fail to resolve any

33

controversy or claim arising out of or relating to the interpretation or application of any term or provision set forth herein, or the alleged breach thereof, such controversy or claim shall also be resolved by arbitration. Any Arbitration hereunder shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA").

21.4 Judgment upon any award rendered pursuant to Section 21.3 herein may be entered in any court having jurisdiction of the Party against whom the award is rendered.

21.5 Any award rendered pursuant to the terms and conditions set forth herein shall be final and binding.

21.6 Any arbitration held pursuant to this Agreement shall be held in Morgantown, West Virginia if arbitration is demanded by Licensor, or in Los Angeles, California if demanded by Mylan. Each Party shall bear its own expenses and shall equally share the administrative expenses of the hearing, including arbitration fees, the expenses of a court reporter, hearing room, etc.

21.7 Mylan acknowledges and agrees that Licensor is relying for its protection upon the existence and validity of the provisions of Articles XXXV, XXXVI and XXXVII, and that irreparable injury (which would not be adequately compensated by monetary damages) will result to Licensor from any violation or continuing violation of such provisions. Accordingly, Mylan hereby agrees that in addition to any other remedies available to Licensor under this Agreement or at law or in equity shall be entitled to seek from a court of competent jurisdiction, equitable

(including injunctive) relief relating to such provisions.

21.8  Notwithstanding any rules or policies of the AAA to the contrary, the standard of proof necessary to establish a breach (or the absence of a cure of such breach) hereunder shall be "clear and convincing".

21.9  With respect to an alleged breach by Licensor of its obligations hereunder Mylan's sole remedy in such arbitration would be a "cease and desist" order or other instructions from the arbitrator as to the procedures to be followed by Licensor to cure such breach;  provided, that if Licensor thereafter fails to comply with such order or instructions, Mylan may demand arbitration to determine such other relief (subject to Section 11.4) as the arbitrator may determine.


ARTICLE XXII.        NO ORAL MODIFICATIONS

No change, modification, extension, termination or waiver of this Agreement or any of the provisions contained herein shall be valid and enforceable unless made in writing and signed by a duly authorized representative of the Party to be bound.


ARTICLE XXIII.        INDEPENDENT CONTRACTORS

This Agreement shall not constitute or give rise to any employer-employee, agency,  partnership  or  joint  venture relationship among the Parties and each Party's performance hereunder is that of a separate, independent entity.

35

ARTICLE XXIV.              NO IMPLIED RIGHTS

    Nothing in this Agreement shall be deemed or implied to be the grant by one Party to the other of any right, title or interest in any product, intellectual property rights or intangibles, material or proprietary rights of the other except as may be expressly provided for in this Agreement.

ARTICLE XXV.              SEVERABILITY

    To the extent that any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Agreement.

ARTICLE XXVI.              MODIFICATION BY OPERATION OF LAW

    If any of the terms or provisions of this Agreement are in conflict with any applicable statute or rule of law, then such terms or provisions shall be deemed inoperative to the extent that they may conflict therewith and shall be deemed to be modified to conform with such statute or rule of law unless such modification would render such provision inconsistent with the intent of the Parties.

ARTICLE XXVII.              MODIFICATION BY AGREEMENT OF PARTIES

    This Agreement may be changed, amended, or otherwise modified only by a written document signed by both parties (or, in the case of a waiver, by the party waiving compliance)

36

ARTICLE XXVIII.            HEADINGS; CAPTIONS

The paragraph and section headings are provided for convenience and are not to be used in construing this Agreement.


ARTICLE XXIX.            SURVIVORSHIP

The provisions of Articles I, IV (to the extent royalties are due at termination), V (to the extent any funds are due and payable pursuant thereto), VI, VII, X, XI, XII, XIII, XIV, XV, XIX, XXI, XXII, XXXV, XXXVI and XXXVII shall survive any expiration or termination of this Agreement.


ARTICLE XXX.            ENTIRE AGREEMENT

This instrument contains the entire agreement between the Parties and supersedes all prior drafts or understandings (including, without limitation the May 24, 1994 letter of intent).


ARTICLE XXXI.            WAIVER

The waiver by either Party to this Agreement of a breach of any provision of the Agreement or of any right contained herein shall not operate or be construed as a waiver of any subsequent breach of right contained herein.


ARTICLE XXXII.            DOCUMENT PREPARATION

The Parties acknowledge this Agreement is a product of negotiations and that no inference should be drawn regarding the drafting of this document.

37

ARTICLE XXXIII.          SINGULAR AND PLURAL

The singular form of any noun or pronoun shall include the plural when the context in which such a word is used is such that it is apparent the singular is intended to include the plural.


ARTICLE XXXIV.          NOTICES

Any notices or reports required or permitted under this Agreement shall be deemed to have been given for all purposes if mailed by first class certified or registered mail or transmitted electronically by telefacsimile with mailed, by first class certified or registered, confirmation copy to the following address of either party:

For Mylan:

          Mylan Laboratories Inc
          781 Chestnut Ridge Road
          Morgantown, WV 26505
          Fax. No. (304)599-7284
          Attn:  Heather Kirby


For Licensor:

          VivoRx Diabetes, Inc.
          3212 Nebraska Avenue
          Santa Monica, CA 90404
          Fax. No. (310)264-7775
          Attn: Patrick Soon-Shiong

ARTICLE XXXV          IMPROVEMENTS

35.1  All Improvements which are made, conceived or reduced to practice by either Party (or their respective employees, agents, representatives or collaborators (either alone or together with others)) shall be the sole property of Licensor provided that any such Improvements shall be included within the meaning of the Licensed Technology licensed to Mylan hereunder.

38

35.2   Mylan agrees to take such further action and execute such further documents as Licensor may reasonably request to vest title in Licensor to any such Improvements.

ARTICLE XXXVI          CONFIDENTIALITY

36.1   For the purpose of this Article XXXVI "Confidential Information" shall mean:

> (i)   as to Licensor, (A) any information relating to the Licensed Technology, and (B) any information relating to the business, financial condition or properties of Licensor or its Affiliates or customers;
>
> (ii)  as to Mylan, any information relating to the business, financial condition or properties of Mylan or its Affiliates or customers.

36.2   During the term of this Agreement (and for a period of ten (10) years hereafter), each Party hereto:

> (i)   shall maintain the confidentiality of the Confidential Information of the other Party hereto using the same degree of care that such Party uses to protect its own Confidential Information (but in no event less than a reasonable degree of care); and
>
> (ii)  shall not use (except as permitted hereunder) or disclose to any Person any such Confidential Information, except as may be required by law or court order

36.3  The obligations of the Parties under Section 36.2 shall not apply to any information:

(i)   which is generally known to the public as of or after the date hereof;

(ii)  becomes generally known to the public after the date hereof for reasons other than a breach by such Party of such Party's obligation hereunder; or

(iii) is received by such Party by an unrelated third party with no restrictions on disclosure.

ARTICLE XXXVII        ADDITIONAL RESTRICTIONS

37.1  Mylan acknowledges and agrees that during the term of this Agreement and for a period of two (2) years thereafter, it will not directly or indirectly:

(a)   except as expressly provided herein, engage in any business, trade or other enterprise substantially similar to human and/or animal cellular encapsulated therapy;

(b)   solicit or entice any current officer, director, employee, consultant or agent of Licensor or any Affiliate of Licensor to leave such entity or work for anyone in direct competition with any such entity; or

(c)   solicit or entice any customer or supplier of any Licensor or any Affiliate of Licensor to limit, curtail or terminate its business with such entity.

40

37.2  Licensor acknowledges Mylan's current product line and expansions thereto include therapeutic entities for use in the treatment and management of diabetes and the development, manufacture, use and sale of same do not violate any term, covenant or condition generally set forth herein, and specifically, set forth in Section 37.1.


ARTICLE XXXVIII       CENTERS FOR EXCELLENCE

Should Licensor establish a relationship with institutions to which it desires Mylan to sell the Licensed Product, Mylan shall not refuse to sell same to such institutions.  The sale of the Licensed Product to such institutions shall be made on the same basis as sales made to institutions of similar or like trade class.  Mylan shall be entitled to proceeds from the sale of the Licensed Product but shall receive no proceeds from additional services or relationships provided by Licensor to such institutions.


IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in duplicate by their duly authorized representatives in the places provided below:

VIVORX DIABETES, INC.                    MYLAN LABORATORIES INC.

By: _____               By: _____

Title: President                         Title: Chairman, CEO and President

Date: August 30, 1994                    Date: August 12, 1994


41

EXHIBIT A

## EXCLUSIVELY LICENSED INTELLECTUAL PROPERTY RIGHTS

A.    Sub-License rights to the following United States Patents as set forth in the "Patent and Technology License And Sublicense License" dated July 19, 1991, by and between Trancel Corporation and Transplant Research Institute:

| Reference No. | U.S. Patent No. |
|---|---|
| 1. | 4,352,883 |
| 2. | 4,391,909 |
| 3. | 4,409,331 |
| 4. | 4,663,286 |
| 5. | 4,673,566 |
| 6. | 4,689,293 |
| 7. | 4,806,355 |

B.    Sub-License rights to the following United States Patents and pending United States Patent Applications as set forth in the "Patent and Technology License and Sublicense License" dated July 19, 1991, by and between Trancel Corporation and Transplant Research Institute:

| Reference No. | U.S. Patent No. |
|---|---|
| 8. | 4,749,620 |
| 9. | 4,744,933 |

## U.S. and International Application Nos.

| | |
|---|---|
| 10. | 07/446,462 |
| | PCT/US90/07108 |
| | "Homologous Guluronic Acid Alginate Coating Composition For In-Vitro Application And Implementation And Method of Using Same" |

42

11.              07/410/091
                    PCT/US90/05289
                    "Cell Separation Invention"

C.   Rights under pending United States and International Patent
Applications

Reference No.              U.S. Patent No.

12.          U.S. Serial No. 07/856,137 and
             PCT/US91/02609 (published 30 Sept. 1993).

13.          U.S. Serial No. 07/866,038
             U.S. Issue Fee Paid May, 1994.
             PCT/US93/03066(published 28 October 1993).

14.          U.S.  Serial No.07/784,267
             PCT/US92/09364 (published 13 May 1993).

15.          U.S. Serial No. 07/981,852
             (filed Nov. 24,1992)
             PCT/US92/10112

16.          U.S. Serial No. 07/891,274
             PCT/US93/05122 (published 9 Dec. 1993).

# VĪVORX

2825 Santa Monica Boulevard
Santa Monica, California 90404

Tel: (310) 264-7768
Fax: (310) 264-7775



July 28, 1998

Mr. Milan Puskar
Mylan Laboratories Inc.
781 Chestnut Ridge Road
Morgantown, West Virginia 26504
Facsimile: (304) 599-7284

Dear Mike:

As you know, Mylan is months in arrears in their payments arising out of their obligations under the terms of the License Agreement. Notice was given in April, June 23, and again on July 22 in respect of expenditures incurred by VivoRx Diabetes Inc, for the three months April to June 1998, in the amount of $2,823,565.

In addition, we have agreed as an interim measure, as a result of the current litigation, that Mylan will continue funding the diabetes project whilst VivoRx Inc will at this stage fund any of the other projects. Reference of this agreement arose out of our telephone discussion on the 8 July followed by my letter to you of the 9 July. In fact, Heather Kirby, together with Anthony Severini, estimated the sums involved, and Mylan made one payment. I now understand that in contravention of its agreement to fund the diabetes project Mylan did not fund the payroll this past Friday, 24 July.

As Mylan has continued to breach the License Agreement, under the terms of Section 9.4 VivoRx Diabetes is entitled to terminate the License Agreement. Should we not receive a payment by Mylan in the amount of $2,823,565 by the close of business on Friday 7 August (which is ten days from today and more than ten days since Mylan first became in arrears in its obligation to fund), we will have available to us all of our legal and equitable rights including, without limitation, the right to terminate the License Agreement.

Mike, I want to work with Mylan and continue with the License Agreement. However, we cannot be placed in a position where Mylan does not honor a material and fundamental obligation of the License Agreement.

Sincerely,

Terrence Soon Shiong
Chief Executive Officer